881 F.2d 44
 28 Fed. R. Evid. Serv. 77
 John Charles LESKO
v.
David S. OWENS, Jr., Commissioner of the Pennsylvania
Department of Corrections; Charles Zimmerman,
Superintendent of the State Correctional Institution at
Graterford; Joseph P. Mazurkiewicz, Superintendent of the
State Correctional Institution at Rockview; Morey M.
Meyers, General Counsel of Pennsylvania; and Leroy
Zimmerman, Attorney General of the Commonwealth of
Pennsylvania, Appellants.
 No. 88-3333.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 17, 1988.
Decided July 27, 1989.
Rehearing and Rehearing In Banc Denied Sept. 1, 1989.
 
 Robert A. Graci (Argued), Office of Atty. Gen., Harrisburg, Pa., John W. Peck, Office of the Dist. Atty., Greensburg, Pa., for appellants.
 Rabe F. Marsh, III (Argued), Welsh White, Costello and Berk, G eensburg, Pa., for appellee.
 Before STAPLETON, SCIRICA and COWEN, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 The Commonwealth of Pennsylvania appeals the district court's grant of a writ of habeas corpus. The question presented is whether the introduction of "other crimes" testimony deprived petitioner John Lesko of his Fourteenth Amendment right to a fair trial. We will reverse the judgment of the district court and remand for determination of other claims raised by petitioner.
 
 I.
 
 2
 In the early hours of January 3, 1980, John Lesko, Michael Travaglia and Richard Rutherford were cruising the outskirts of the city of Pittsburgh in a stolen sports car. The trio drove past police officer Leonard Miller, sitting in his patrol car parked at the side of the road outside the Stop-and-Go convenience store. Travaglia, the driver of the car, stated that he "wanted to have some fun with this cop." Travaglia raced past the officer's car beeping his horn, but no pursuit followed. Travaglia turned the car around, again sped past the patrol car, and again failed to elicit a response. The third time Travaglia sped past, Officer Miller turned on his lights and gave chase. Lesko turned to Rutherford in the back seat and cautioned him to "lay down in the back, because it might turn into a shooting gallery."
 
 
 3
 A moment later, Officer Miller managed to force the sports car off the side of the road. The officer approached the car on foot. Travaglia rolled down his window, extended his .38 caliber hand gun, and shot Officer Miller twice from close range. Officer Miller returned fire, shattering the passenger side of the window. The three companions sped away. The gunshot wounds Officer Miller received proved fatal.
 
 
 4
 The trio had begun their escapade together a few hours earlier, in the late evening of January 2, 1980, at a hot dog shop in Pittsburgh. At Travaglia's instruction, Lesko and Rutherford went to the alleyway behind the Edison Hotel, and waited. About ten minutes later a sports car appeared. Travaglia sat in the front seat beside the driver and owner of the car, William Nicholls, a stranger. While Lesko and Rutherford were climbing into the back seat, Travaglia pulled out a .22 caliber hand gun and shot Nicholls in the arm.
 
 
 5
 After Travaglia took the driver's seat, Lesko told Rutherford to handcuff Nicholls behind the back. As Travaglia drove, Lesko repeatedly punched Nicholls in the face and chest, calling him a queer. Lesko asked Nicholls if he wanted to perform oral sex on him, and taunted him with a knife. Meanwhile, Lesko took Nicholls's belongings, a wallet and an extra set of keys, and told Rutherford to place them in the glove compartment. After Nicholls lost consciousness, Rutherford and Lesko gagged him with a scarf. Travaglia stopped the car near a lake in a wooded area. Lesko propped Nicholls against a nearby tree, his hands cuffed, his mouth gagged, and his feet bound with a belt. Travaglia and Lesko dragged Nicholls down to the lake and rolled him into the water, where he disappeared.
 
 
 6
 The three men drove to Travaglia's father's house, where Travaglia knew his father kept a gun. Lesko and Rutherford waited in the car while Travaglia entered the house. Travaglia returned with a .38 caliber handgun, which he handed to Lesko. Upon inspection, Lesko discovered that it contained only bird shot. Travaglia, who had begun driving away, turned the car around and returned to his father's house. Travaglia instructed Rutherford to retrieve the box of bullets lying in the trunk of the car parked inside the garage. Lesko stood guard outside. Armed with the gun that had wounded Nicholls, Lesko warned Rutherford that if anything went wrong, Rutherford "had six shots to get out." Rutherford returned with the box of bullets, and the trio drove off. It was these bullets that killed Officer Miller.
 
 
 7
 After the Miller shooting, Lesko and Travaglia returned to Pittsburgh. At the hot dog shop they met a friend, Keith Montgomery, whom they took to a room in the Edison Hotel and told about the Miller shooting. Travaglia told Montgomery, "I shot a cop." Lesko added, "I wanted to." Travaglia then gave Montgomery the .38 caliber gun used to shoot Officer Miller. When the Pittsburgh police found Montgomery with that same gun later that evening, Montgomery told the police how he had gotten the gun, and that it had been used to shoot a policeman. Lesko and Travaglia were arrested that night. Before surrendering, Lesko pointed a gun at the police.
 
 
 8
 After receiving Miranda warnings, Lesko and Travaglia each gave statements admitting involvement in the killing of Officer Miller. Lesko told the police that he and Travaglia had instigated the car chase with Officer Miller, "So he'd be chasing us ... and the car was fast and that--we'd lose him and could go and knock off the Stop-N-Go." In contrast, Travaglia told the police that he was "playing around with [Officer Miller], trying to aggravate him, and I figured he couldn't chase me across county lines; and since he did, I figured if I pointed the gun at him and told him to throw his gun away, he couldn't stop me and I could keep on going. In the process of pulling the gun on him, the hammer slipped and the shot discharged." Lesko and Travaglia also admitted killing William Nicholls. Additionally, they both implicated themselves in two other shooting murders--that of Peter Levato and Marlene Sue Newcomer--committed within the last three days.
 
 
 9
 In January, 1981, Travaglia and Lesko were tried jointly for the Miller homicide. There had been two changes in venue and a change in venire. Although the trial was held in Westmoreland County, Western Pennsylvania, the jury was selected in Berks County, located in the eastern part of the state. By that time, Travaglia and Lesko had already pled guilty to second degree murder in Indiana County for the Nicholls homicide. For the Miller shooting, both men were charged with first degree murder, Lesko as an accomplice to the principal Travaglia, and for criminal conspiracy to commit murder. They were both convicted of first degree murder and sentenced to death.
 
 
 10
 At trial, Lesko and Travaglia's sole defense to the charge of first degree murder was that they each lacked the requisite intent to kill. Lesko's counsel argued principally that his client was at most guilty of felony-murder.[1] He argued that in instigating the police chase, defendants planned first to divert the officer from the Stop-and-Go store, and later return to rob the establishment. Therefore, Lesko's lawyer urged, the killing was not pre-meditated, but was the unintended result of a botched robbery attempt. Travaglia's lawyer, meanwhile, emphasized that pulling the trigger had been accidental, a result of the hammer of the gun having slipped as Travaglia aimed at the officer.[2] Neither defendant testified at the guilt phase of the trial. However, statements they made in their taped confessions to the police, which the Commonwealth introduced into evidence, were relied on by defense counsel in support of their respective defense theories.
 
 
 11
 Rutherford was the Commonwealth's principal witness at trial. Rutherford testified about the Miller homicide[3] and the abduction and killing of Nicholls. Both Lesko and Travaglia objected to Rutherford's testimony of the Nicholls murder. Initially, both defendants moved to exclude all reference to the Nicholls murder, contending that its sole purpose was to demonstrate defendants' bad character and propensity to commit similar crimes.
 
 
 12
 The trial judge permitted Rutherford's testimony to prove motive and state of mind. He stated that he was admitting the evidence because it was probative of the Commonwealth's theory that the officer was not killed as a result of an accident, but was killed because he had approached perpetrators of theft and murder in possession of incriminating evidence, namely, Nicholls' stolen car and wallet, and the gun used to shoot Nicholls in the arm when he was first abducted. Both defendants thereafter moved to limit Rutherford's testimony on the Nicholls' murder to establishing only that the car was stolen, Nicholls was murdered, and they possessed items linking them to these prior crimes when Officer Miller approached the car. The trial judge denied the motion, ruling that the details of the Nicholls murder were relevant to petitioner's state of mind. The court explained that the severity of the Nicholls murder, and its temporal proximity, made it more likely than not that the defendants would attempt to avoid apprehension at any cost, going so far as to murder a police officer.
 
 
 13
 After determining that the evidence was admissible to prove motive or intent, the trial judge balanced the testimony's probative value against its potential for prejudice, as Pennsylvania law requires. He concluded that the former outweighed the latter, as the testimony reduced the possibility that the killing of Miller was done without intent, or by accident, and could prove essential in establishing the degree of murder. He therefore allowed the jury to hear Rutherford's full account of the Nicholls homicide.
 
 
 14
 Defense counsel did not request an immediate limiting instruction to the jury. During the jury charge, the judge instructed the jury that they were to use Rutherford's testimony only for the limited purpose of "tending to show [a] motive for the killing [of Officer Miller] ... and [thereby] ... rebutting ... the allegation that the shooting was accidental." In addition, the trial judge issued the following warning:
 
 
 15
 You must not regard this evidence [of the Nicholls murder] as showing that the defendants are persons of bad character or criminal tendencies which [sic] you might be inclined to infer guilt. If you find the defendants or either of them guilty, it must be because you are convinced by the evidence that he or they committed the crimes charged and not because you believe he or they are wicked or have committed other offenses.
 
 
 16
 As we have stated, the jury found Lesko and Travaglia guilty of murder in the first degree and of criminal conspiracy to commit murder. At the sentencing phase it returned a verdict of death for both defendants.[4] Lesko appealed his conviction and death sentence directly to the Pennsylvania Supreme Court.[5] That court rejected all sixteen issues raised by petitioner and his co-defendant on appeal, including the argument that the death sentences were disproportionate and excessive. The court affirmed the convictions and death sentences. Commonwealth v. Travaglia, 502 Pa. 474, 467 A.2d 288 (Pa.1983); Commonwealth v. Lesko, 502 Pa. 511, 467 A.2d 307 (Pa.1983). Thereafter, the United States Supreme Court denied Lesko's writ of certiorari. Lesko v. Pennsylvania, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), reh'g denied, 468 U.S. 1226, 105 S.Ct. 27, 82 L.Ed.2d 920 (1984). Lesko's petition under Pennsylvania's Post Conviction Hearing Act, 42 Pa. Cons Stat. Ann. Secs. 9541-9551 (Purdon 1982), was denied by the Common Pleas Court and also on appeal. Commonwealth v. Lesko, 509 Pa. 67, 501 A.2d 200 (Pa.1985). In the post-conviction appeal, the Pennsylvania Supreme Court again rejected Lesko's argument that the death sentence was disproportionate. Id. at 78-79, 501 A.2d at 206. Lesko's request for rehearing before the Pennsylvania Supreme Court was denied. Commonwealth v. Lesko, 509 Pa. 625, 506 A.2d 897 (Pa.1986). Thereafter, the United States Supreme Court denied Lesko's second petition for writ of certiorari. Pennsylvania v. Lesko, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987).
 
 
 17
 While Lesko's petition for certiorari was pending, he filed a petition for writ of habeas corpus in the United States District Court pursuant to 28 U.S.C. Sec. 2254 (1982), contending that errors undermined his trial, conviction, and sentence.[6] Finding that Lesko had exhausted his state court remedies, the district court determined that his due process rights were violated and granted relief. Lesko v. Jeffes, 689 F.Supp. 508, 509 (W.D.Pa.1988).
 
 
 18
 The district court found that the admission of Rutherford's testimony recounting the Nicholls killing was error of constitutional magnitude. The court ruled that while it would have been permissible to admit evidence that Nicholls had been killed, that his car had been stolen, and that the car and other property belonging to Nicholls was in the possession of the defendants, the probative value of any further details was "non-existent" and the potential for prejudice severe. Id. at 515. Noting that no cautionary instruction prefaced the Rutherford testimony, the district court found that the limiting instruction in the judge's jury charge "could not have remedied the prejudice created by the admission of the evidence." Id. The district court then subjected the constitutional violation it had found to harmless-error analysis.[7] The district court stated that it could not find beyond a reasonable doubt that the details of the Nicholls' murder played no role in the jury's deliberations, specifically, concerning the degree of guilt. Id. at 516. As a final matter, the district court concluded that even assuming arguendo the inevitability of a conviction of first degree murder, it could not find beyond a reasonable doubt that the details of the Nicholls murder did not influence the jury during the penalty phase to return a verdict of death. Id.II.
 
 
 19
 A state prisoner must exhaust available state remedies before filing a petition for habeas corpus in federal court. 28 U.S.C. Secs. 2254(b) & (c) (1982); Ross v. Petsock, 868 F.2d 639 (3d Cir.1989). Though not a jurisdictional requirement, the exhaustion rule is more than a mere formality; it serves the interest of comity between the federal and state systems. Castille v. Peoples, --- U.S. ----, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989); Gibson v. Scheidemantel, 805 F.2d 135 (3d Cir.1986). To demonstrate compliance with the exhaustion requirement, a habeas applicant must show that the claim included in the federal petition was fairly presented to the state courts. Castille v. Peoples, 109 S.Ct. at 1060; Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). This requires that the claim brought in federal court be the substantial equivalent of that presented to the state courts. Id. at 278, 92 S.Ct. at 513. Both the legal theory and the facts supporting a federal claim must have been submitted to the state courts. Ross v. Petsock, 868 F.2d at 641; Gibson v. Scheidemantel, 805 F.2d at 139.
 
 
 20
 We conclude that petitioner has exhausted his state court remedies. On direct appeal to the Supreme Court of Pennsylvania, petitioner argued that the trial court had erred in admitting Rutherford's testimony because its probative value was outweighed by its prejudicial effect. The Pennsylvania Supreme Court, after finding that the details of the Nicholls homicide, as developed by Rutherford's testimony, were relevant to prove defendants' motive and state of mind, held that "while the possibility of prejudice existed, it was heavily outweighed by the probative value of Rutherford's testimony." Travaglia, 502 Pa. at 492, 467 A.2d at 297. Lesko's federal petition for writ of habeas corpus alleges that the probative value of Rutherford's testimony was outweighed by its prejudicial effect, and therefore its admission was erroneous. The legal theory (the probative value of evidence was outweighed by its prejudicial effect) and the facts (the substance of Rutherford's testimony) on which Lesko's federal claim rests, had been submitted to the state courts. Thus, the issue decided by the Pennsylvania Supreme Court was the substantial equivalent of Lesko's fourteenth amendment claim. See McMahon v. Fulcomer, 821 F.2d 934, 941 (3d Cir.1987) (petitioner's claim that trial judge improperly required him to act as his own counsel was substantial equivalent of his sixth amendment claim).
 
 III.
 
 21
 Our review of the district court decision to grant the writ is plenary. We derive this standard from the function of a reviewing court in a habeas corpus proceeding. Federal courts "do not sit to retry state cases de novo but, rather, to review for violations of federal constitutional standards." Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972); see also United States ex rel. Abdus-Sabur v. Cuyler, 653 F.2d 828, 833-34 (3d Cir.) (in banc), cert. denied, 454 U.S. 1088, 102 S.Ct. 650, 70 L.Ed.2d 625 (1981); Bisaccia v. Attorney Gen. of New Jersey, 623 F.2d 307, 312 (3d Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980). Accordingly, petitioner claims that the admission of inflammatory evidence violated his fourteenth amendment right to a fair trial. The district court found such a violation. Thus, in examining the district court opinion, we evaluate whether the district court correctly found that admission of evidence amounted to error of constitutional proportion. Whether an error reaches the magnitude of a constitutional violation is an issue of law, subject to plenary review. See Sullivan v. Cuyler, 723 F.2d 1077, 1082 (3d Cir.1983).
 
 
 22
 In arguing that the district court's decision should receive the "clearly erroneous" standard of review, petitioner misunderstands our holdings in Sullivan, 723 F.2d1077, and Krasnov v. Dinan, 465 F.2d 1298 (3d Cir.1972). Although in Sullivan we subjected a portion of a district court decision in a habeas corpus proceeding to the "clearly erroneous" standard of review, we did so because the district court had ordered an evidentiary hearing, and made subsequent factual findings as to whether there was an actual conflict of interest in representation of a criminal defendant. Sullivan, 723 F.2d at 1082, 1083. The standard of review enunciated in Krasnov, meanwhile, is completely inapposite; Krasnov concerns a district court's finding of facts as to the existence of diversity jurisdiction.[8]
 
 IV.
 
 23
 The Commonwealth initially argues that in finding that the probative value of Rutherford's testimony was "non-existent," the district court "exceeded its authority in a habeas proceeding." From the well-established principle that states have broad discretion to develop rules of evidence they will apply in their criminal proceedings, the Commonwealth contends that because the Pennsylvania Supreme Court has already held Rutherford's testimony relevant to prove motive and intent, the district court was "bound to accept the determination of relevance made under state laws and apply the due process balance to determine if that relevance was outweighed by the prejudicial impact of the statement."
 
 
 24
 We do not believe that the district court exceeded the scope of its authority in a habeas corpus proceeding. Clearly, at the heart of petitioner's complaint is a challenge to a state court evidentiary ruling. Yet this court, along with other federal courts of appeals, has recognized that the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation. See, e.g., United States ex rel. Mertz v. New Jersey, 423 F.2d 537, 539-40 (3d Cir.1970); Dudley v. Duckworth, 854 F.2d 967, 972 (7th Cir.1988), cert. denied --- U.S. ----, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989); Walker v. Engle, 703 F.2d 959, 968 (6th Cir.), cert. denied sub nom. Marshall v. Walker, 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983); Osbourne v. Wainwright, 720 F.2d 1237, 1239 (11th Cir.1983) (per curiam); Panzavecchia v. Wainwright, 658 F.2d 337, 341-42 (5th Cir.1981). Accordingly, a reviewing court must examine the relative probative and prejudicial value of evidence to determine whether its admission violated defendant's right to a fair trial. In this case, the district court explained that it was reviewing for constitutional error, not errors in state law, and thus examined the testimony's probative worth to assess the constitutional implications of the state court's ruling. See 689 F.Supp. at 513.
 
 
 25
 We point out, however, that just as "[n]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice,' " United States ex rel. Perry v. Mulligan, 544 F.2d674 (3d Cir.1976) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)), cert. denied, 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977), not every error in balancing probative value against prejudicial effect "amount[s] to error which rises to constitutional dimensions." See United States ex rel. Mertz v. New Jersey, 423 F.2d at 539-40. In Bisaccia v. Attorney Gen. of New Jersey, 623 F.2d 307 (3d Cir.), cert. denied 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980), we identified at what point such an error in balancing might be cognizable in a habeas proceeding:When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law.
 
 
 26
 623 F.2d at 313 (quoting United States ex rel. Bibbs v. Twomey, 506 F.2d 1220, 1223 (7th Cir.1974)). Accord Osbourne v. Wainwright, 720 F.2d 1237, 1239 (11th Cir.1983) (per curiam) (error in balancing must be of "such magnitude" as to deny fundamental fairness); United States ex rel. Palmer v. DeRobertis, 738 F.2d 168, 171 (7th Cir.) (when probative value of evidence is "greatly outweighed" by the prejudice to the accused, then use of such evidence may "rise to the posture of the denial of fundamental due process"); Thompson v. Oklahoma, --- U.S. ----, 108 S.Ct. 2687, 2722, 101 L.Ed.2d 702 (1988) (Scalia, J., dissenting) (addressing issue not reached by majority opinion). Therefore, only if the inflammatory nature of Rutherford's testimony so plainly exceeds its evidentiary worth, will we find that a constitutional error has been made.
 
 
 27
 Additionally, we note that in evaluating the decisions of our own federal trial courts (over which we have supervisory power and therefore are obligated to correct erroneous interpretations of the Federal Rules of Evidence), we have cautioned that "if judicial self-restraint is ever desirable, it is when a Rule 403 analysis [balancing probative and prejudicial effect] of a trial court is reviewed by an appellate tribunal." United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). The reason for this deference is apparent:
 
 
 28
 Like any balancing test, the ... standard is inexact, requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference to the hands-on judgment of the trial judge.
 
 
 29
 United States v. Guerrero, 803 F.2d 783, 785 (3d Cir.1986).
 
 
 30
 In sum, our scope of review in this case is limited. We inquire whether the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial. Moreover, we will accord the state trial judge the deference we accord our federal trial judges, who are in a unique position to assess the relative probative value and inflammatory effect of proffered testimony.
 
 V.
 
 31
 We now turn to petitioner's claims of unfair prejudice. For clarity, we note what is not at issue here. In his habeas corpus petition, Lesko claims that any mention of the Nicholls murder was inadmissible, as irrelevant and unduly prejudicial. The district court, however, rejected this argument, ruling that,
 
 
 32
 The killing of Officer Miller ... could be seen to be consistent with an attempt to avoid apprehension. Had the trial court limited the testimony of Rutherford, as requested by petitioner's counsel, excluding the details of the torture-murder of Nichols [sic], the Court would be unwilling to conclude that a fair trial had been denied.
 
 
 33
 689 F.Supp. at 515. Thus, the issue in this appeal is whether Rutherford's account of the Nicholls incident was relevant to either motive or intent, and whether its prejudicial effect so conspicuously exceeds its evidentiary worth as to violate the federal constitution.
 
 
 34
 Under Pennsylvania law, while evidence of other unrelated criminal conduct of the accused is generally inadmissible to prove the commission of the crime, such evidence is admissible where relevant to prove: (1) motive, (2) intent, (3) a common scheme or plan involving the commission of two or more crimes so closely related that proof of one tends to prove the other, (4) the identity of the perpetrator, or (5) the absence of mistake or accident. Commonwealth v. Styles, 494 Pa. 524, 525-26, 431 A.2d 978, 980 (Pa.1981). In addition, "other crimes" evidence, though relevant, must be excluded if the probative value is outweighed by the danger that the facts offered may unduly arouse the jury's prejudice or hostility. Commonwealth v. Travaglia, 502 Pa. at 492, 467 A.2d at 297. Applying this law to Rutherford's testimony, the Pennsylvania Supreme Court held that "the details of the incidents which occurred just a short time prior to Officer Miller's shooting were developed to show that the Appellants ... were in a stolen car, with the victim Nicholls' personal belongings and two firearms which could connect them to the prior wrongdoing," and therefore introduced to show motive and intent. Id. at 493, 467 A.2d at 297. In addition, the court held that their probative value outweighed their prejudicial effect. Id. at 492, 467 A.2d at 297.
 
 
 35
 Each court that has examined the facts of this case, including the district court, has held that evidence of the occurrence of the Nicholls killing was relevant to proving intent. As in all homicide cases, the jury's perception of state of mind of Lesko and Travaglia at the time of killing determined the degree of murder. To establish Lesko's accomplice culpability for first degree murder, the Commonwealth was required to prove that petitioner, with the intent of promoting or facilitating the commission of first degree murder, aided, agreed, or attempted to aid Travaglia in planning or committing the murder of Officer Miller.[9] In addition, the defenses raised by Lesko (felony murder rather than premeditated homicide) and Travaglia (accidental rather than intentional shooting), compelled the Commonwealth to introduce evidence demonstrating that Lesko and Travaglia intended to kill Officer Miller, and that they had motives to do so. It is generally recognized that evidence of motive may be probative of specific intent, particularly for crimes that are allegedly motivated by the desire to interfere with law enforcement. See E. Cleary, McCormick on Evidence Sec. 190 at 562-63 & n. 35 (3d ed.1984). Thus, one means of proving Lesko's intent to promote or facilitate Travaglia's act of murder, is to establish that Lesko, like Travaglia, had a motive to kill. In sum, proof of Lesko's state of mind, and, consequently, any motive he might have had to kill Officer Miller, were genuinely at issue in the case.
 
 
 36
 We find that just as the occurrence of the Nicholls murder was relevant, the Nicholls incident as a whole was relevant to a central issue in the case--the motive and state of mind of Lesko and Travaglia. As we have discussed, the Commonwealth sought to demonstrate that both the trigger-man Travaglia and passenger Lesko, if approached by a law enforcement officer, intended to go to any length to hide the facts of their prior crime and, moreover, had motive to take such a drastic approach. Where the motive of a killing is interference with law enforcement--in this case the most extreme example, killing a policeman--the severity and circumstances of the crime being hidden is highly probative. If, for example, the Nicholls killing had been accidental, or in self-defense, Lesko arguably would have been less likely to take such extreme measures to avoid apprehension. On the other hand, apprehension and prosecution for a murder as deliberate as the Nicholls homicide, could have dire consequences in the event of a conviction. Furthermore, Rutherford's account of the events leading to the Miller homicide conveys the temporal proximity of the Nicholls homicide, which reinforces the Commonwealth's theory that the Nicholls murder figured prominently in defendants' minds as Officer Miller approached the stolen sports car.[10]
 
 
 37
 As we have already suggested, Rutherford's testimony is also probative to rebut Lesko's defense regarding his state of mind during the Miller incident. First, by stressing that the incident was best characterized as "felony murder," Lesko was essentially urging the jury to believe that while he admittedly agreed to instigate the car chase, he had no knowledge from the surrounding circumstances that the chase would culminate in murder, and played no role in promoting such an outcome. During his summation, Lesko's counsel argued that Lesko's remark that "this place might turn into a shooting gallery" was "the statement of any would-be robber in a car driven by a man with a gun...." In other words, Lesko was asserting that he had participated in a crime--but that crime was attempted burglary or robbery, not first degree murder. To view the Miller incident in isolation would render Lesko's claim plausible. On the other hand, Lesko's assertion that in the moments before the Miller killing, he had promoted only the commission of robbery and burglary (but not murder) appears less credible if one learns that just a few hours before, both he and Travaglia had deliberately and fully participated in the Nicholls homicide. In this context, this evidence was probative to show that in participating in the instigation of the police chase and through his talk about a "shooting gallery," Lesko shared Travaglia's intent to open fire and encouraged Travaglia to do so.[11]
 
 
 38
 In a second and related aspect of his defense, Lesko portrayed himself as a passive observer of Travaglia's allegedly unilateral decision to open fire on Officer Miller. Lesko's lawyer argued in summation that "John Lesko was sitting in the car as Ricky Rutherford was.... He was a passenger. He didn't shoot Officer Miller. Ricky Rutherford didn't shoot Officer Miller. Mike Travaglia shot Officer Miller." Similarly, during summation, Lesko's lawyer read from Lesko's statement to the police, in which Lesko explained that, "[the officer] put on his lights and started chasing us. The police officer went down, and that there. I heard six shots come through the window beside me, and when I looked up, it was all busted out...." Thus, the in limine motion offered by defendants was sparse and, from an evidentiary point of view, sterile. The motion proposed to stipulate only that Nicholls had been killed and that Lesko possessed items tying him to the crime, including a gun, a wallet, and a stolen car. The jury would not have learned that Lesko had willingly and fully participated in all of the evening's activities, which included a prior homicide.
 
 
 39
 In summary, the central issue in the Commonwealth's case against Lesko was whether he deliberately supported Travaglia in a premeditated killing of Miller or whether he was guilty only of participating in an abortive attempt at robbery. Members of the jury could not have determined what was in Lesko's mind based solely on the events immediately preceding Miller's death. The jury could only have fairly evaluated the Commonwealth's theory regarding Lesko's state of mind by hearing evidence tending to show that Travaglia and Lesko had jointly embarked that evening on a crime spree, that they had already committed a homicide likely to command the death penalty, and that they had in their possession powerful evidence of their guilt of that homicide. Moreover, to be in a position to evaluate Lesko's state of mind during the critical moments during the Miller encounter, the jury needed to hear sufficient details about these matters to be able to appreciate the nature of the evening's joint undertaking, the relationship and mood of the participants, and the extent of the criminal exposure of those participants in the event of their apprehension by Miller. If one views Rutherford's testimony as furnishing the overall context in which Travaglia and Lesko acted in the few minutes preceding Miller's death, then this testimony plays a critical role in enabling the jury to evaluate the Commonwealth's proposed scenario as compared with the defendants' alternative explanation of events.
 
 
 40
 Having determined that the evidence was probative as to state of mind, we now consider its potential to create unfair prejudice. Evidence may be "unfairly" prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." United States v. Guerrero, 803 F.2d at 785. The acts committed by petitioner are shocking and therefore capable of eliciting an emotional response from the jury. Nevertheless, given the probative value of Rutherford's testimony as to Lesko's motive to kill Officer Miller, and to refute his self-portrayal as a passive observer, we do not find that the prejudicial impact outweighs its probative value--no less that it does so in a manner so conspicuously as to rise to the level of a constitutional violation. In reaching this conclusion, we are mindful not only that prejudice must be great enough to reach the magnitude of a constitutional violation, but also that the trial judge, rather than the reviewing court, is in the best position to assess the impact of that prejudice.
 
 
 41
 In arguing for the exclusion of the testimony adjudged relevant by the trial court, petitioner cites various cases in support of the proposition that "due process can be denied where the manner of introduction of relevant evidence is prejudicial." We find these cases to be inapposite. In United States ex rel. Bibbs v. Twomey, 506 F.2d 1220 (7th Cir.1974), a case on which Lesko relies, the prosecutor introduced into evidence four prior crimes committed by defendant to impeach the credibility of the defendant on cross-examination. This amounted to ten pages of testimony that had no bearing on any element of the crime with which the accused was charged. Understandably, the reviewing court found that the prosecutor's recitation of the four prior crimes constituted "undue repetition, excessive concentration, and over-dramatization." Similarly, in United States v. Dow, 457 F.2d 246 (7th Cir.1972), also relied on by petitioner, cross examination of defendant focused excessively on his prior criminal record; the prosecutor slowly elicited the details of each of the defendants prior convictions, which included prison escape, auto theft, robbery and assault, and which bore only on the issue of defendant's credibility. In Lesko's case, we find no such excessive concentration or embellishment. Rutherford merely narrated the series of events; the record reveals no repetition, embellishment, or dramatics. Likewise, the prosecutor in summation referred only briefly to the Nicholls murder, without mentioning a single detail. Further, there was no mention of the details of the prior murder during the penalty phase of trial. Therefore, because we do not find prejudicial the "manner" of introduction of the Nicholls murder, nor do we see prosecutorial misconduct, we regard the cases Lesko cites as inapposite.
 
 
 42
 Finally, any potential for unfair prejudice by the admission of this evidence was limited by the clear instructions the jury received in the final charge. When testimony is offered for a specific, proper purpose, limiting instructions have the ability to forestall its possible prejudicial effects. As the Supreme Court has stated, "limiting instructions on this subject are no more difficult to comprehend or apply than those upon various other subjects." Spencer v. Texas, 385 U.S. 554, 562-63, 87 S.Ct. 648, 653, 17 L.Ed.2d 606 (1967) (citation omitted). The instruction given here was clear and directly on point. The jury was told that they were to convict defendants only "because you are convinced by the evidence that he or they committed the crimes charged and not because you believe he or they are wicked or committed other offenses."
 
 
 43
 It is not argued, moreover, that the jury instructions given here were deficient. Rather, the district court held that they were ineffective because they were given at the conclusion of the trial, about a week after Rutherford's testimony. This omission, however, is attributable to the defense counsel's failure to request an immediate cautionary instruction. Consequently, were Lesko himself to complain of the lack of a cautionary instruction, his burden of proof would be heavy. See Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (heavy burden in collateral attack to demonstrate that jury instruction, which was never requested, "so fatally infected the entire trial that the resulting conviction violates dues process") (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). Although it would have been desirable for the trial judge to have immediately given a cautionary instruction regarding the purpose for which this evidence was admitted, we do not believe that the failure to do so--by itself--so fatally infected the trial as to deny Lesko due process of law.
 
 VI.
 
 44
 We now turn to the impact of Rutherford's testimony on the jury's verdict on the imposition of sentence. At the sentencing phase, the Commonwealth sought to establish two "aggravating circumstances" under the Pennsylvania sentencing code: first, the victim was a police officer, 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(1), and second, Lesko had been convicted of a crime for which death or life imprisonment was imposable, 42 Pa.Con.Stat.Ann. Sec. 9711(d)(10).[12] As proof of the latter aggravating circumstance, the jury was informed at the sentencing phase that Lesko had pled guilty to second degree murder, that pleading guilty constituted a "conviction" under the Pennsylvania statute,[13] and that he automatically received a life sentence for this conviction. The Commonwealth did not mention the details of the Nicholls murder and the trial judge did not instruct the jury to consider them. Nevertheless, Lesko claims that the sentencing phase of his trial was constitutionally defective because it was conducted with the jury knowing not merely that a prior murder had occurred, but knowing additionally the circumstances surrounding the Nicholls homicide. Stated otherwise, Lesko argues that the sentencing verdict, although ostensibly resting on the "aggravating circumstances" enumerated in the statute, was tainted with evidence not properly before the jury. This argument does not withstand scrutiny. As both a statutory and constitutional matter, the other offenses perpetrated in conjunction with the Nicholls murder were properly before the jury during the penalty phase.
 
 
 45
 Pennsylvania's sentencing scheme limits the jury's consideration of "aggravating circumstances" to those specified by statute. 42 Pa.Cons.Stat.Ann. Sec. 9711(a)(2). Nevertheless, we believe that under Sec. 9711(d)(10), the jury properly considered the other offenses perpetrated in conjunction with the Nicholls homicide. In Commonwealth v. Beasley, 505 Pa. 279, 479 A.2d 460 (1984), the Pennsylvania Supreme Court upheld the imposition of the death penalty where the jury had learned as a statutory "aggravating circumstance" under Sec. 9711(d)(11) not only that the defendant had been convicted of a prior crime for which a death sentence was imposable, but also that the victim in the previous homicide was a police officer. In so holding, the court interpreted the term "convictions" in Sec. 9711(d)(11) to permit consideration of "the essential and necessary facts pertaining to the conviction, including the circumstances of the crimes and the sentences imposed." 505 Pa. at 289, 479 A.2d at 465 (emphasis added).[14] The Beasley court explained its decision as follows:
 
 
 46
 In this Commonwealth, sentencing has long been regarded as having at its core a function of character analysis, see Commonwealth v. Bell, [417 Pa. 291, 208 A.2d 465 (1965) ], and the central idea of the present sentencing statute is to allow a jury to take into account such relevant information, bearing upon a defendant's character and record, as is applicable to the task of considering the enumerated aggravating circumstances. Consideration of prior "convictions" was not intended to be a meaningless and abstract ritual, but rather a process through which a jury would gain considerable insight into a defendant's character. The nature of an offense, as ascertained through examination of the circumstances concomitant to its commission, has much bearing upon the character of a defendant, and, indeed, without reference to those facts and circumstances, consideration of "convictions" would be a hollow process, yielding far less information about a defendant's character than is relevant.
 
 
 47
 Id.[15] Thus, the bad acts committed during the Nicholls murder, as circumstances of that murder, were properly considered under Sec. 9711(d)(10).
 
 
 48
 This conclusion is constitutionally sound. In Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d235 (1983), the Supreme Court discussed the aggravating factors properly considered by a jury in the sentencing phase of a capital case:
 
 
 49
 Our cases indicate ... that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.
 
 
 50
 Id. at 878-79, 103 S.Ct. at 2743-44 (1983) (emphasis in original). This passage answers Lesko's claim that the jury's consideration of the circumstances of the Nicholls murder invalidates his sentencing proceeding.
 
 
 51
 As a general matter, the Zant Court clarified that to protect adequately against the arbitrary imposition of the death penalty, see id. at 874-76, 103 S.Ct. at 2741-42, the decision maker must engage in an individualized character analysis of each defendant.[16] In other words, unlike in the guilt phase of trial where fairness requires that "character evidence," though relevant to the proceeding, be excluded to ensure that the jury does not punish the accused regardless of the sufficiency of the evidence in the case, see E. Cleary, McCormick on Evidence at Sec. 190 at 557 (3d ed. 1984); United States v. Guerrero, 803 F.2d at 785, in the penalty phase of trial, the jury necessarily focuses its attention on the character of the defendant. Applying this reasoning, we find nothing irrational orunconstitutional in the judgment of the Beasley court that knowledge of the circumstances of the prior crime, rather than merely of the conviction alone, most directly advances the goal of character assessment. As part and parcel of Lesko's background and prior record, the events leading up to the Nicholls killing properly informed the jury's individualized assessment of Lesko's character and concomitant decision on the appropriateness of the imposition of penalty.
 
 
 52
 Furthermore, the Zant decision affirmed the settled rule that the circumstances of the crime for which defendant was being sentenced were properly before the jury during the sentencing stage. In Lesko's direct appeal, the Supreme Court of Pennsylvania held that the details of the Nicholls murder were properly before the jury at the sentencing phase:
 
 
 53
 There may be circumstances where evidence, deemed admissible at trial because its relevance to the determination of guilt outweighs its possible prejudice, should nevertheless be excluded because it is so inflammatory that its relevance to determination of sentence would be outweighed by its potential for prejudice.... In most cases, however, the decision that the evidence is admissible for purposes of the guilt phase renders it ... admissible for the penalty phase as part of the "circumstances" to be considered by the jury.
 
 
 54
 Travaglia, 502 Pa. at 493-94, 467 A.2d at 298. We agree. As we have explained earlier, the Nicholls incident was not a "prior crime" unrelated to the crime for which he was being sentenced. Rather, the entire Nicholls incident furnished the context and motive for the Miller homicide. Accordingly, as the jury determined the penalty for the Miller homicide, it was relevant that the murder occurred in the course of a crime spree including, among other crimes, another cruel killing.
 
 
 55
 The relevance of the Nicholls incident to Lesko's sentencing proceeding comes into sharper focus when compared with factors the Zant Court characterized as "constitutionally impermissible or totally irrelevant to the sentencing process," id. at 885, 103 S.Ct. at 2747. As examples of such impermissible factors, the Court listed "the race, religion, or political affiliation of the defendant." Id. Subsequently, in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court found an example of considerations totally irrelevant to the sentencing proceeding, introduced in the form of a "Victim Impact Statement" (VIS), which focused on the personal characteristics of the victim and the severe emotional impact of the crime on the victim's family. Invoking the lesson of Zant v. Stephens that the jury's sentencing decision is properly based on the "character of the individual and the circumstances of the crime," 482 U.S. at 502, 107 S.Ct. at 2532, the Booth Court characterized VIS evidence as irrelevant, highly inflammatory, and capable of diverting the jury's attention away from "the defendant's background and record, and circumstances of the crime," id. at 505-08, 107 S.Ct. at 2534. See also South Carolina v. Gathers, --- U.S. ----, ----, 109 S.Ct. 2207, 2210-11, 104 L.Ed.2d 876 (1989) (Eighth amendment violated where prosecutor's closing argument at sentencing phase included lengthy reading from religious tract victim was carrying and mention of victim's voter registration card, as such extensive focus on character of victim does not "relate directly" to circumstances of the crime). In this case, there is no claim that the consideration of the Nicholls incident introduced into the sentencing proceeding constitutionally improper criteria such as race or religion. Furthermore, unlike the VIS which distracted the jury's concentration from the relevant evidence concerning the defendant himself, the evidence at issue here focuses directly on the defendant's background and character, and was therefore highly relevant to the sentencing process.
 
 
 56
 Although we believe that the Nicholls incident would have been properly introduced under Pennsylvania's sentencing statute, we note that under the Zant analysis, the constitutionality of the jury's consideration of aggravating factors is an issue independent of state law. The Zant Court rejected the notion that a death sentence could be tainted by evidence other than that which forms the statutory justification for imposing the death sentence, noting that "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death," id. at 874-75, 103 S.Ct. at 2741. Later in the opinion, the Court again stated that while a defendants's prior history of noncapital cases could not by itself provide sufficient justification for imposing the death sentence, "[n]othing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination." Id. at 888, 103 S.Ct. at 2748. Thereafter, in Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the Court held that although the state sentencing statute forbid the jury to consider defendant's prior criminal record, this violation of state law did not violate the federal constitution. Id. at 956, 103 S.Ct. at 3428. Therefore, in assessing the severity of the aggravating circumstances, the Lesko jury could constitutionally consider the other offenses perpetrated during the Nicholls homicide, regardless of the state statutory scheme.
 
 
 57
 In addition, the limits on the jury's consideration of nonstatutory aggravating factors suggested by Supreme Court dicta prove inapplicable to this case. There is no question that the Lesko jury found at least one statutory aggravating circumstance. See Barclay v. Florida, 463 U.S. at 966-67, 103 S.Ct. at 3433 (Stevens, J., concurring) ("a death sentence may not rest solely on nonstatutory aggravating factor") (citing Zant v. Stephens, 462 U.S. at 876-78, 103 S.Ct. at 2742-43). In returning its sentencing verdict, the jury expressly informed the trial court that it had found two aggravating factors under the Pennsylvania sentencing statute: first, the victim was a police officer, 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(1), and second, Lesko had been convicted of a crime for which death or life imprisonment was imposable, 42 Pa. Con. Stat. Ann. Sec. 9711(d)(10). Thus, the sentencing statute in this case indisputably served its constitutional function of circumscribing the class of persons eligible for the death penalty, see Zant v. Stephens, 462 U.S. at 878-79, 103 S.Ct. at 2743-44. Additionally, some language in the Zant opinion arguably suggests that undue emphasis on nonstatutory aggravating circumstances might form the basis of a valid constitutional attack. See id. at 888-89, 103 S.Ct. at 2748-49. As we have already noted, during the guilt phase of trial there was no embellishment or histrionics on the Nicholls incident. Similarly, neither the Commonwealth nor the trial judge mentioned the details of the Nicholls murder at the penalty phase. Consequently, Lesko cannot claim that there was particular emphasis placed on these prior offenses and surrounding circumstances.
 
 
 58
 As a final matter, we address the dissent's suggestion that Supreme Court dicta in the plurality opinion in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), undermines our analysis. Infra, at 65. Beginning with the proposition that a jury is more likely to impose a sentence of death than a trial judge, the dissent argues that the Gregg dicta supports the conclusion that the jury could not during the sentencing phase have ignored the evidence relevant to the guilt phase, and therefore this evidence was improperly admitted. We disagree. The Gregg plurality, after recognizing that "much of the information that is relevant to the sentencing phase may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question [of guilt]," declared that a bifurcated trial is the "best answer" to this "scarcely insurmountable" problem. 428 U.S. at 190, 96 S.Ct. at 2933 (emphasis added). We first note that because the sentencing procedure follows the determination of guilt, a bifurcated trial could not solve this problem of spillover. Thus, total exclusion from trial presents the only answer. In Lesko's direct appeal, the Supreme Court of Pennsylvania, while recognizing the need for balancing, stated that in most circumstances,
 
 
 59
 [w]here facts are relevant for a proper purpose at trial, defendants may not be heard to complain about the horrid character of such facts. To find otherwise would give rise to the perverse result that a capital defendant would benefit more, the more horrid the background circumstances were.
 
 
 60
 Travaglia, 502 Pa. at 493-94, 467 A.2d at 298. More importantly, the Gregg dicta rests on the principle that the evidence to be admitted at the sentencing phase was completely irrelevant on the issue of guilt. The converse of this problem appeared in South Carolina v. Gathers, --- U.S. ----, 109 S.Ct. 2207, 104 L.Ed.2d 876, where in the penalty phase, the prosecutor impermissibly focused on items belonging to the victim, which were properly admitted to the guilt phase, but irrelevant to an individualized determination of defendant's personal culpability. Id. at ---, 109 S.Ct. at 2209-11. In contrast, we have found that the details of the Nicholls murder were relevant to both guilt and sentencing. Thus, we hold that their probative value, evaluated from both phases of the trial, compared with their prejudicial impact, permitted the jury to consider them at the penalty phase.
 
 VII.
 
 61
 The admission into evidence of Rutherford's account of the Nicholls murder did not violate the due process clause of the Fourteenth Amendment. The testimony was probative as to petitioner's motive and intent; thus, absent some sort of prosecutorial misconduct such as excessive reference or embellishment, its potential for unfair prejudice did not so conspicuously outweigh the probative value, that its mere admission denied petitioner a fair trial.
 
 
 62
 We will reverse the decision of the district court and remand for determination of the other claims petitioner raised in his petition for writ of habeas corpus.
 
 
 63
 COWEN, Circuit Judge, dissenting.
 
 
 64
 In light of the substantial deprivation of fundamental due process raised in the record before me, I respectfully dissent.
 
 I.
 
 65
 The question presented on this appeal is whether the prosecutor had license to present every lurid detail of the murder of William Nicholls during Lesko's trial for the murder of Police Officer Miller. The majority holds that the details of the Nicholls abduction and torture-murder are relevant to the issues of motive and intent.[1] While the murder itself is relevant, I believe the gruesome details of the murder are not. Even if the details of the Nicholls murder were relevant, evidence of the prior crime is admissible only if the probative worth of this evidence is not substantially outweighed by the tendency to prejudice the jury. In this case, the unfair prejudice to Lesko resulted in a denial of his right to a fair trial.
 
 A.
 
 66
 The main issue at trial was the degree of Lesko's guilt--not whether or not he was guilty. The thrust of his defense was that he was guilty of, at most, felony-murder, because the killing of Officer Miller was not premeditated. The jury's refusal to find Lesko guilty of felony-murder and its finding, instead, that he was a principal to Travaglia's first-degree murder of Miller, was a likely result of the jury's reaction to the prosecutor's dwelling on the gruesome killing of Nicholls. See United States v. Johnson, 820 F.2d 1065, 1069 (9th Cir.1987) ("[u]nfair prejudice is measured by the degree to which a jury responds negatively to some aspect of the evidence unrelated to its tendency to make a fact in issue more or less probable"). I agree with the views expressed by Judge Ackerman, who in dissenting from the Westmoreland County Court en banc, stated that:
 
 
 67
 After reading Rutherford's testimony before the jury, I am constrained to conclude that its prejudicial impact outweighed its probative evidentiary value.
 
 
 68
 ....
 
 
 69
 All homicides are grim and juries are entitled to know all of the relevant facts pertaining to the particular case that they are sworn to hear, but to expect jurors or anyone else to consume the loathsome scenario described above pertaining to a completely different crime without feeling revulsion, passion and hatred for the perpetrators because of it, is contrary to my view of human nature. In addition, armed with the confessions of the defendants and an eye witness to the Miller homicide, it would seem to have been unnecessary.
 
 
 70
 The details of how Mr. Nicholls was shot, kidnapped, robbed and tortured before he was thrown alive into a frozen lake would, in my opinion, cause a bias in the most devoted juror and standing alone would negate the presumption of innocence.
 
 
 71
 Commonwealth v. Lesko, Westmoreland County Court, No. 681 C 1980, slip op. at 4, 6 (en banc) (Ackerman, J., dissenting) (footnote omitted).
 
 
 72
 The Federal Rules of Evidence attempt to guard against such an unduly prejudicial use of evidence by requiring a balancing of the probative value against the prejudicial effect.[2] In this case, the district judge found the probative value to be "non-existent." Lesko v. Jeffes, 689 F.Supp. 508, 515 (W.D.Pa.1988). I agree. The majority opines, however, that "Rutherford's testimony is ... probative to rebut Lesko's defense regarding his state of mind during the Miller incident." Maj. op. at 54. The majority further states that "[w]here the motive of a killing is interference with law enforcement--in this case the most extreme example, killing a policeman--the severity and circumstances of the crime being hidden is highly probative." Maj. op. at 53.
 
 
 73
 The only logical interpretation of the majority's reasoning is that the more prejudicial the evidence is, the more probative it becomes. What the majority fails to recognize, however, is that while the probative value may be increased by some small amount, the prejudice increases exponentially. Further, the probative value in this case, if any, is clearly diminished by the availability of other direct and sufficient evidence of the crime. Consequently, as the prejudice factor increased exponentially after Rutherford's testimony, the probative value of that testimony dwindled in light of the other evidence proffered by the Commonwealth.
 
 
 74
 This Court has acknowledged that "[i]n determining the admissibility of evidence, the circumstances surrounding the introduction of the testimony and the purposes for which it is sought to be introduced are critical." United States ex rel. Choice v. Brierley, 460 F.2d 68, 71 (3d Cir.1972). The extent to which the evidence may be cumulative or unnecessary may be considered in the balancing. The Advisory Committee Notes to Rule 404(b)[3] state that where the evidence of prior bad acts is offered for a permissible purpose, "[t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decisions of this kind under Rule 403." (emphasis added). See also Government of the Virgin Islands v. Felix, 569 F.2d 1274, 1279-80 (3d Cir.1978); John McShain, Inc. v. Cessna Aircraft Co., 563 F.2d 632, 635 (3d Cir.1977) ("A sensitive analysis of the need for the evidence as proof on a contested factual issue, of the prejudice which may eventuate from admission, and of the public policies involved is in order ..."); United States v. Cook, 538 F.2d 1000, 1004 (3d Cir.1976) ("This balancing test is the modern bastion of a long standing tradition that protects a criminal defendant from 'guilt by reputation' and from 'unnecessary prejudice' "); see also Commonwealth v. Bond, 261 Pa.Super. 311, 319, 396 A.2d 414, 418 (Pa.Super.Ct.1978) ("even though evidence of prior crimes might be relevant, its admission must be based on a balancing of several considerations: on the one hand, the actual need for the evidence in light of the issues and the other evidence available to the prosecution ... and on the other hand, the degree to which the jury would probably be roused by the evidence to overmastering hostility") (emphasis added); Commonwealth v. Ulatoski, 472 Pa. 53, 63, 371 A.2d 186, 191 n. 11 (Pa.1977).
 
 
 75
 Under the facts of this case, the lurid details of the Nicholls homicide elicited from Rutherford were in no way necessary. In light of the eyewitness testimony and the confessions, the state would have had no difficulty proving that the offense was committed; that Lesko was at the scene; and that given the mere fact of the prior murder and the fact that the defendants were in Nicholls' car when they were spotted by Officer Miller, the defendants had a motive to kill Miller. The confessions of both Lesko and Travaglia, which were read to the jury in question and answer form in a dialogue between the prosecutors and police officers on the witness stand, clearly establish the motive to kill Officer Miller. For example, the Commonwealth introduced Travaglia's statement, containing among other damning admissions, the following:
 
 
 76
 Q. Right. On the night this happened, can you tell us what happened?
 
 
 77
 A. The shooting?
 
 
 78
 Q. Yes.
 
 
 79
 A. Well, I was playing around with him, trying to aggravate him, and I aggravated him, and I figured he couldn't chase me across the county lines; and since he did, I figured if I pointed the gun at him and told him to throw his gun away, he couldn't stop me and I could keep on going. In the process of pulling the gun on him, the hammer slipped and the shot discharged.
 
 
 80
 Q. Okay. All right. And then after the shot discharged, then what happened?
 
 
 81
 A. I shot again.
 
 
 82
 ....
 
 
 83
 Q. Okay. And who loaded the weapon?
 
 
 84
 A. I loaded the weapon.
 
 
 85
 ....
 
 
 86
 Q. Okay. How many shots did you fire at the officer?
 
 
 87
 A. Just two.
 
 
 88
 ....
 
 
 89
 Q. All right. When you decided--What made you decide to stop?
 
 
 90
 A. Well, the stolen vehicle.
 
 
 91
 ....
 
 
 92
 Q. Okay. When he--Once the first shot was fired, what did he do then?
 
 
 93
 A. He stumbled backwards, and he fell down on one knee, and he started to get back up; that's when I fired the second one.
 
 
 94
 Trial Transcript at 682-90. Lesko' Westmoreland County counsel aptly stated that the prosecutor was "trying to kill a rabbit with a pumpkin ball instead of the buckshot that he should have." App. at 66.
 
 
 95
 The majority simply fails to offer any reason why the details of the Nicholls murder are relevant apart from the fact of the Nicholls murder. The majority, in several instances, refers to "Rutherford's account" or "Rutherford's testimony" in passages attempting to justify the admission into evidence of the lurid details. These terms fail to distinguish between the components of the account, i.e., between the mere fact of the murder and the details of the murder. For example, the majority states that "Rutherford's account of the events leading to the Miller homicide conveys the temporal proximity of the Nicholls homicide, which reinforces the Commonwealth's theory that the Nicholls murder figured prominently in defendants' minds as Officer Miller approached the stolen sports car." Maj. op. at 53 (footnote omitted). Such statements confuse and blur the distinction between the relevancy of the murder and that of the details. Perhaps this sentence can be construed, upon distillation, to say that the details are necessary to show the temporal proximity of the Nicholls murder. The temporal proximity, however, was never in dispute. In any event, the majority apparently concedes in this passage that the mere fact of the murder suffices to convey such proximity as the majority states that it was the "Nicholls murder" which figured prominently in the defendants' minds and not the details of the murder.
 
 
 96
 Additionally, the Commonwealth argued that the Nicholls murder was part of the "res gestae." App. at 79-81. The majority's apparent agreement and characterization of the events as a single criminal episode muddles the requirement of relevancy and effectively negates the presumption of innocence. The majority states that "[t]he jury could only have fairly evaluated the Commonwealth's theory regarding Lesko's state of mind by hearing evidence tending to show that Travaglia and Lesko had jointly embarked that evening on a crime spree...." Maj. op. at 54. The majority further states that, "to be in a position to evaluate Lesko's state of mind during the critical moments during the Miller encounter, the jury needed to hear sufficient details about [the Nicholls murder] to be able to appreciate the nature of the evening's joint undertaking...." Id. at 54. Most astoundingly, the majority adds that "the Nicholls incident was not a 'prior crime'...." Maj. op. at 58.
 
 
 97
 Unlike the majority, I view the Miller homicide as a separate crime even though it occurred within hours of the Nicholls murder.[4] To enable a jury to infer specific intent to commit first degree murder from a description of a prior torture-murder effectively stripped Lesko of his presumption of innocence in the Miller trial. In this case, the evidence merely shows the "bad character" of the defendant. Such "bad character" evidence is inadmissible in light of the fact that Lesko did not even testify or in any way put his character in issue. Evidence is prejudicial if it " 'arouses [the jury's] sense of horror, provokes its instinct to punish,' or otherwise '... cause[s] a jury to base its decision on something other than the established propositions in the case.' " United States v. Guerrero, 803 F.2d 783, 785 (3d Cir.1986) (quoting Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir.1980)); see also United States v. Bailleaux, 685 F.2d 1105, 1109 (9th Cir.1982) ("the use of [other crimes] evidence must be narrowly circumscribed and limited" because of danger that the defendant will be convicted upon improper inference); Government of the Virgin Islands v. Felix, 569 F.2d 1274, 1280 (3d Cir.1978) ("What is required in order to permit testimony about other crimes, first of all, is that it be 'relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime' ") (citation omitted). Certainly, the trial judge's limiting instruction--given at the close of the case one week after Rutherford's elaborate recitation of the lurid Nicholls details--could not remedy the prejudicial effect of Rutherford's testimony. For a jury to so limit their consideration would require "a feat of psychological wizardry verg[ing] on the impossible even for berobed judges." United States ex rel. Scoleri v. Banmiller, 310 F.2d 720, 725 (3d Cir.1962), cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963). An image so astounding is, most probably, unforgettable. The likelihood of rational analysis prevailing after having heard Rutherford's testimony is minimal.
 
 B.
 
 98
 The majority confidently states that "[a]s both a statutory and constitutional matter, the circumstances of the Nicholls murder were properly before the jury during the penalty phase." Maj. op. at 56. For this proposition, they cite Commonwealth v. Beasley, 505 Pa. 279, 479 A.2d 460 (Pa.1984) and Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). I do not share the majority's confidence in the constitutionality of the jury's consideration of the details of the Nicholls murder in the penalty phase of the trial.[5]
 
 
 99
 Zant appears to stand for the proposition that while statutory aggravating circumstances are constitutionally necessary at the stage of legislative definition as they describe the class of persons eligible for the death penalty, the Constitution does not require the jury to ignore other possible aggravating factors in a capital sentencing determination. While Zant deals with consideration of the fact of prior convictions which do not rise to the level of an aggravating circumstance, Zant arguably does not deal with the issue of consideration of the details which form the basis for the prior convictions.[6] The Supreme Court has not, heretofore, directly addressed this issue.[7]
 
 
 100
 The fact that a jury, and not a judge, is charged with sentencing makes it more likely that the jury will impose a sentence of death, not for the crime presently tried, but for the prior crime. In this case, where the prior crime is a heinous torture-murder, that possibility becomes a probability. Given that the jury heard that Lesko abducted Nicholls in his car; that Travaglia shot Nicholls in the arm and made him drive with this wound; that both Lesko and Travaglia verbally abused Nicholls; that Lesko physically battered Nicholls to a point of semi-consciousness; and that Lesko assisted in tying a boulder to Nicholls and in throwing him into a frozen lake, the more likely result is that the jury sentenced Lesko to death, not for the murder of Miller where the evidence against him was scant, but rather, for the murder of Nicholls. Absent admission of the Nicholls details, the jury may have meted out a life sentence to Lesko given the scant evidence against him in the Miller trial. However, upon hearing the account of the prior torture murder, it is reasonable to conclude that few jurors would have had difficulty imposing a sentence of death.
 
 
 101
 The United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), commented on the danger of prejudice in cases where a jury may impose a capital sentence. The Court cited, with approval, statements by the drafters of the Model Penal Code including a statement that "[t]rial lawyers understandably have little confidence in a solution that admits the evidence and trusts to an instruction to the jury that it should be considered only in determining the penalty and disregarded in assessing guilt." 428 U.S. at 191, 96 S.Ct. at 2933 (citing ALI, Model Penal Code Sec. 201.6, Comment 5 at 74, Tent. Draft No. 9, 1959).[8] The Court noted that "[i]n other situations this Court has concluded that a jury cannot be expected to consider certain evidence before it on one issue, but not another." 428 U.S. at 190 n. 40, 96 S.Ct. at 2933 n. 40 (citations omitted).
 
 
 102
 Further, counsel for the state conceded at oral argument that the gruesome details would not be permitted in the penalty phase. The jurors were not specifically told during the penalty phase to disregard the details of the Nicholls murder. Perhaps the state should not be permitted to use such a "backdoor" approach to "admit" inflammatory evidence for the jury's consideration in the penalty phase. This tactic is akin to telling someone who has just seen a "pink elephant" to forget about seeing the pink elephant.
 
 II.
 
 103
 An equally troubling part of this case concerns an issue which, while not addressed by the district court, was the first argument presented in Lesko's habeas petition. While it may be more prudent not to initiate an examination which the district court will have to undertake on remand, I feel compelled to address what I view as a gross violation of due process which provides an alternative basis for granting the writ of habeas corpus.
 
 
 104
 In his Petition for Writ of Habeas Corpus to the United States District Court for the Western District of Pennsylvania, Lesko alleges the following violation of a plea agreement:
 
 
 105
 1. Petitioner's death penalty is in violation of the due process clause of the Fourteenth Amendment because it was obtained after the Commonwealth violated a plea agreement by admitting Petitioner's prior guilty plea to second degree murder into evidence during the penalty phase of Petitioner's trial. Facts supporting this claim
 
 
 106
 2. Prior to his trial for first degree murder in Westmoreland County, Petitioner entered into a plea agreement under which he plead guilty to second degree murder in Indiana County.
 
 
 107
 3. One of the material terms of the plea agreement was that Petitioner's guilty plea would not be introduced into evidence at the murder trial in Westmoreland County.
 
 
 108
 4. During the penalty phase of Petitioner's trial for murder in Westmoreland County, the prosecutor, over proper objection by defense counsel ... was allowed to introduce Petitioner's guilty plea to the Indiana County second degree murder charge into evidence.
 
 
 109
 5. In order to fulfill the terms of the Indiana County plea agreement, it is necessary to vacate Petitioner's death sentence and require the Commonwealth to either (1) conduct a new penalty trial at which Petitioner's guilty plea to the Indiana County murder charge is not introduced into evidence or (2) sentence Petitioner to life imprisonment.
 
 
 110
 Petition for Writ of Habeas Corpus at 9 (June 11, 1986). The district judge, in granting Lesko's Habeas Petition, only addressed the issue of the admissibility of the details of the Nicholls murder, stating in a footnote that "[i]n light of his disposition of the matter, the Court finds it unnecessary to address the remaining issues raised by the petitioner." Lesko v. Jeffes, 689 F.Supp. 508, 510 n. 1.
 
 
 111
 Whether or not the plea agreement was impermissibly used in the Westmoreland County trial is an issue which unquestionably impinges on Lesko's fundamental due process rights. If it is true that the agreement was breached by the government, the guilty plea in Indiana County could not have counted as one of the two aggravating circumstances which the jury found during the sentencing phase of the trial. The same result applies if the plea is found to be involuntary. The difficulty of this issue is magnified by the complicated procedural history of the case. Therefore, a review of the procedural history as it relates to the plea may be useful.
 
 A.
 
 112
 In 1980, Lesko was awaiting trial on charges of criminal homicide in both Indiana County and Westmoreland County. On May 19, 1980, Lesko agreed to plead guilty to second degree murder in Indiana County with the understanding that related charges would be dismissed and sentencing would be deferred. At all times, with regard to the Indiana County proceedings, Lesko was represented solely by Attorney John Armstrong of Indiana County, Pennsylvania. The plea colloquy was transcribed and makes no mention of an agreement not to introduce the Indiana guilty plea in Westmoreland County. Surprisingly, no written record of the plea bargain exists.[9]
 
 
 113
 Lesko filed a motion to withdraw his guilty plea in the Indiana case on December 3, 1980, prior to his trial in Westmoreland County. In January of 1981, Lesko was tried in Westmoreland County for Officer Miller's murder. At the sentencing hearing, the Commonwealth called an assistant district attorney from Indiana County to establish that Lesko had been previously convicted of an offense "for which a sentence of life imprisonment ... was imposable." 42 Pa.Cons.Stat.Ann. Sec. 9711(a)(10). See Sentencing Hearing Transcript at 1389-93. Though this testimony was objected to on the ground that there was no conviction as sentence had not yet been imposed, there was, at this time, no request for an evidentiary hearing to establish a breach of the plea agreement. Lesko's Westmoreland County counsel did state that "Mr. Lesko and his counsel in Indiana County had moved the Court to withdraw the guilty plea, and that has not been resolved." Sentencing Hearing Transcript at 1404. At this time, Lesko's counsel requested an evidentiary hearing only on the question of the pendency of the motion to withdraw the guilty plea. Id. at 1427-28.
 
 
 114
 On direct appeal from the imposition of the death penalty, Lesko raised the issue that the lower court erred in permitting the Commonwealth to introduce Lesko's guilty plea to the Nicholls killing as an aggravating circumstance. The alleged breach by the Commonwealth of its plea bargain agreement with Mr. Lesko was explicitly argued in Lesko's brief. However, the Pennsylvania Supreme Court did not discuss the matter in its majority opinion and order. See Commonwealth v. Travaglia, 502 Pa. 474, 467 A.2d 288 (Pa.1983). But see 502 Pa. at 507-08, 467 A.2d at 305 (Nix, J., concurring) (stating that he joins "in the Court's mandate today with the caveat that the death penalty will be carried out only after a review of [the challenges to the pleas] by this Court and only if after such review it is determined that the pleas were voluntarily and knowingly entered and the request for withdrawal was properly refused"). The issue was also briefed by Lesko's counsel in his Application for Reargument. See Brief for Appellant at 4. This Application was denied.
 
 
 115
 After his conviction in the Westmoreland County case, Lesko filed an amended motion to withdraw his Indiana County guilty plea on April 13, 1981. He alleged a breach of the plea agreement because an "implicit" part of the agreement was that the Indiana County homicide would not be used in the penalty phase in Westmoreland County. A hearing was held on this motion. Lesko's Indiana County lawyer, John H. Armstrong, stated during the hearing that "[i]t was implicit in that [plea] agreement that this [the Indiana guilty plea] was not being used for the purposes of showing a conviction here in Indiana County." See Record of Proceedings (April 28, 1981) at 9. Lesko did not testify concerning his understanding of the agreement. Armstrong presented no other evidence concerning what, if anything, he told Lesko concerning the plea agreement. He explained his legal opinion (which later proved to be faulty) that the plea could not be used to establish an aggravating factor unless a sentence had been imposed. The District Attorney testified that there was never any discussion of this implicit agreement. Id. at 37-40.
 
 
 116
 The Indiana County trial judge rejected Lesko's claim and denied his motion to withdraw on June 5, 1981. It is apparent from the trial judge's "Findings of Fact" that he found that the entire plea agreement was as set forth during the guilty plea colloquy as there was no written record of the actual bargain struck. See Opinion and Order of the Court (June 6, 1981) at 6. The government agrees that the trial judge found the entire agreement to be embodied in the plea colloquy as transcribed. See Appellant's Letter Memorandum (dated February 27, 1989) at 2, 3. Thus, the trial judge failed to consider the allegations of an implicit agreement arising out of any other discussions which may have occurred.
 
 
 117
 Despite the assertions of Lesko's attorney in open court, the Indiana County trial judge found "that the defendant's assertions are fiction and that the defendant knowingly, voluntarily, and intelligently entered his plea as part of his Westmoreland County 'death trial' strategy." Opinion and Order of the Court at 6 (June 6, 1981).[10] It is apparent from the remaining Findings of Fact that the trial judge was considering only the plea colloquy as transcribed which as all parties acknowledge, makes no reference to the implicit agreement which allegedly induced Lesko to plead guilty.
 
 
 118
 The "breach of the plea" issue was raised as the first argument in Lesko's Petition for Post Conviction Relief. The Court of Common Pleas of Westmoreland County refused Lesko's request for an evidentiary hearing. During the Post Conviction Hearing Act proceedings, Common Pleas Judge Mihalich, without hearing the testimony of Armstrong, based his refusal to hear this evidence on the ground that the testimony was irrelevant because he believed the matter had been previously considered by the Pennsylvania Supreme Court in Commonwealth v. Lesko, 502 Pa. 511, 467 A.2d 307 (Pa.1983), which upheld Lesko's conviction in the Nicholls murder case in Indiana County. Furthermore, Judge Mihalich based his refusal to hear evidence on the mistaken notion that a district attorney's plea agreement in one county of Pennsylvania cannot be binding in another county of the Commonwealth.[11]
 
 
 119
 While the Pennsylvania Supreme Court did conclude in Commonwealth v. Lesko, 502 Pa. 511, 518, 467 A.2d 307, 310 (Pa.1983) that "[t]he Appellant argues that by the terms of the agreement, the Indiana County conviction could not be used in his Westmoreland County trial" and that "[w]e have reviewed the record and find no such agreement," the Commonwealth never bothered to hear Lesko's proffered evidence, including the testimony of his attorney, Armstrong, who represented him in Indiana County, Pennsylvania.
 
 B.
 
 120
 Attorney Armstrong was apparently willing to testify that Lesko's guilty plea was induced by a promise that the plea would not be used as an aggravating circumstance in the trial in Westmoreland County. For example, at the Post-Conviction Hearing Act proceedings, Lesko's Westmoreland County counsel offered to show that:
 
 
 121
 Mr. Armstrong ... entered into a plea bargain arrangement with the district attorney of Indiana County; that that plea bargain was that Mr. Lesko would enter a plea of guilty to murder of the second degree concerning Mr. Nicholls; that sentence would not be imposed on that plea until after the trial on the Miller homicide in Westmoreland County; and it was understood that that arrangement was for the purpose that the guilty plea to the Nicholls homicide would not be introduced as a prior conviction in the Westmoreland County proceedings; that that was the understanding between the district attorney of Indiana County and Mr. Armstrong; that was what Mr. Armstrong conveyed to Mr. Lesko as the essence of the agreement; that Mr. Lesko understood that if he pleaded guilty to second degree murder of Mr. Nicholls, that that would not be used as a prior conviction in the Miller case; that that agreement was violated by the district attorney of Westmoreland County introducing that plea in Indiana County as a conviction, prior conviction in the Miller case.
 
 
 122
 See Post Conviction Hearing Act Transcript at 3 (emphasis added). The Commonwealth objected to the proffered testimony of Attorney Armstrong claiming that the matter had been finally litigated in the earlier appeals to the Pennsylvania Supreme Court. Lesko's Petition was dismissed.
 
 
 123
 On appeal, the Supreme Court affirmed the dismissal of the Post Conviction Hearing Act petition, rejecting the claim of a breached agreement and agreeing that this issue had been "finally litigated."[12] See Commonwealth v. Lesko, 509 Pa. 67, 81-87, 501 A.2d 200, 207-10 (Pa.1985). The Pennsylvania Supreme Court determined that Lesko's argument that he "believed" the terms of the bargain would preclude use of the Nicholls murder as an aggravating circumstance was only a "variant" of his argument made during the hearing to withdraw his plea--namely, that there was an "implicit" agreement between Lesko and the state. 509 Pa. at 85-86, 501 A.2d at 208. I believe that this was an error which resulted in a denial of due process.
 
 
 124
 Three related types of challenges to guilty pleas should be carefully distinguished. First, a defendant may assert that an explicit agreement between the state and him has been breached. Second, a defendant may assert that his attorney misapprehended the nature of the state's case or the likely penalties attached to alternative courses of action.[13] Finally, a defendant may assert that his counsel induced him to plead guilty by conveying to the defendant that the state has unequivocally agreed to some course of action, when in fact, unbeknownst to the defendant, the attorney has no such agreement.
 
 
 125
 The Pennsylvania Supreme Court's characterization of Lesko's proffered argument as a mere "variant" fails to make the crucial distinction between the establishment of the existence of the plea and the issue of the voluntariness of the plea--or between the first and the third types of challenges. The third challenge concerns only what may have transpired between Lesko and his Indiana County counsel. Yet the statements relied on by the state courts to deny Lesko's claim pertain only to the statements by the state denying the existence of an implicit agreement.[14] Consequently, Lesko has never been given the opportunity to address the issue of whether he was induced to plead guilty by his Indiana County counsel who led him to believe that his Indiana County plea could not be used against him in Westmoreland County. Clearly, this is a different issue from whether or not the state promised him directly that the plea would not be used.
 
 
 126
 Significantly, Lesko's present Westmoreland County counsel state now represent to this Court that:
 
 
 127
 Mr. Lesko's Westmoreland County counsel had no opportunity to participate for the purpose of presenting evidence or cross-examining other witnesses. Mr. Lesko has indicated to Mr. White and me, however, that his agreement with the District Attorney of Indiana County was that if he entered a plea of guilty to the Nicholls homicide, that plea would not be entered in the Westmoreland County trial on the Miller homicide. At this point it would be appropriate to point out that Mr. White and I have also never had the opportunity to present the testimony of our client, in any proceedings, concerning this issue.
 
 
 128
 Appellee's Letter Memorandum at 2 (February 15, 1989). Based on all of Lesko's counsels' representations, if believed, it is clear that Lesko believed the plea agreement to include a promise by the State not to use the plea in the Miller case. In any event, it appears to be a material fact in dispute.
 
 
 129
 I acknowledge that if Lesko relied on his attorney's faulty analysis of the law with respect to whether a deferred sentence would count as a conviction--the second type of challenge described above--this reliance would be insufficient to render a guilty plea invalid on a collateral attack. See Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In Brady, the petition entered a knowing and voluntary plea of guilty to kidnapping in violation of 18 U.S.C. Sec. 1201(a). In United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), nine years after Brady's plea, the United States Supreme Court ruled that the provision of section 1202(a) which provided for the death penalty only upon the recommendation of the jury was unconstitutional. In assessing the validity of Brady's plea on review of a collateral attack, the Supreme Court in Brady stated that:
 
 
 130
 A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.
 
 
 131
 397 U.S. at 757, 90 S.Ct. at 1473 (citation omitted).
 
 
 132
 "[I]t is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." United States v. Broce, --- U.S. ----, ----, 109 S.Ct. 757, 765, 102 L.Ed.2d 927 (1989) (quoting Mabry v. Johnson, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984)). Yet the fact that Lesko may have been induced by his counsel to believe that his plea would not count as an aggravating circumstance is an issue which goes to the voluntariness of his plea which may be the basis for a collateral attack. This Court has stated that "the district court must hold an evidentiary hearing where there is a material dispute of fact, unless the state court provided the petitioner a full and fair evidentiary hearing on the issue." Bibby v. Tard, 741 F.2d 26, 31 (3d Cir.1984); see also Sullivan v. Cuyler, 723 F.2d 1077, 1084 (3d Cir.1983) ("Federal courts, in habeas proceedings, must accord a presumption of correctness to state factfindings. That presumption is inoperative, however, if the merits of the factual dispute were not resolved in the state hearing. In such circumstances, the federal court must grant an evidentiary hearing to a habeas applicant.") (citations omitted). The fact that Lesko has been denied an evidentiary hearing on this point is a gross violation of due process as it resulted in improper sentences in two cases.
 
 
 133
 The United States Supreme Court's decision in Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977), indicates that an evidentiary hearing should be held. In Blackledge, the United States Supreme Court affirmed an order of the court of appeals remanding a habeas corpus petition by a state prisoner to the district court for a hearing on the merits, if needed. The Court found, under the facts of that case, that the record of a state guilty plea proceeding was inconclusive with regard to the claim for relief in the habeas petition. The state court record consisted only of a preprinted, thirteen question "Transcript of Plea" which made no mention of any plea agreement. 431 U.S. at 65-67, 97 S.Ct. at 1624-26.
 
 
 134
 In his habeas petition, Allison alleged, in more than conclusory language, that he pleaded guilty because of an express promise not reflected on this form. Id. at 67-69, 97 S.Ct. at 1626-27. The Court expressed its reluctance to allow state prisoners to so challenge apparently valid guilty pleas in federal habeas proceedings. It noted, however, that there were circumstances, as those alleged by Allison, in which the federal court would be required to hold an evidentiary hearing on the claim before acting on its merits. In reaching this decision, the Court considered it important that plea bargaining had only recently been given official approval at the time Allison entered his state court plea on January 24, 1972. See Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The Court noted that North Carolina had, since Allison's plea, adopted stringent procedures for plea bargaining "in part to prevent the very kind of problem now before us." 431 U.S. at 79, 97 S.Ct. at 1632 (footnote omitted). The Court said:
 
 
 135
 Had these commendable procedures been followed in the present case, Allison's petition would have been cast in a very different light. The careful explication of the legitimacy of plea bargaining, the questioning of both lawyers, and the verbatim record of their answers at the guilty-plea proceedings would almost surely have shown whether any bargain did exist and, if so, insured that it was not ignored.
 
 
 136
 431 U.S. at 79, 97 S.Ct. at 1632 (footnote omitted).
 
 
 137
 The Indiana County district attorney's testimony that there was no such agreement is not dispositive if the issue is the voluntariness of the plea based on Lesko's subjective understanding of the plea agreement as induced by his Indiana County lawyer. Because "[s]olemn declarations in open court carry a strong presumption of verity[,]" Blackledge, 431 U.S. at 74, 97 S.Ct. at 1629, it is significant that Lesko's Indiana County counsel declared in open court that there was such an implicit understanding. Lesko's Westmoreland County counsel have also made similar representations. See Appellee's Letter Memorandum (February 15, 1989). Indeed, "[i]n administering the writ of habeas corpus and its Sec. 2255 counterpart, the federal courts cannot fairly adopt a per se rule excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." 431 U.S. at 75, 97 S.Ct. at 1630 (footnote omitted).
 
 
 138
 While the Supreme Court in Blackledge was careful to state that in some cases an evidentiary hearing would not be required, it did state that the petitioner is "entitled to careful consideration and plenary processing of [his claim] including full opportunity for presentation of the relevant facts." Id. at 82-83, 97 S.Ct. at 1633 (citation omitted).
 
 C.
 
 139
 As a result of the Commonwealth's failure to properly assess the voluntariness of Lesko's plea, Lesko's guilty plea was improperly introduced into evidence in the penalty phase of his capital trial in Westmoreland County. The introduction was highly prejudicial to Lesko given that Lesko's prior conviction for second degree murder is an aggravating circumstance as defined by 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(10).[15] In imposing the death penalty, the jury indicated that mitigating circumstances were present. Thus, the jury was authorized by the statute to impose death only if the "aggravating circumstances ... outweigh any mitigating circumstances." 42 Pa.Cons.Stat.Ann. Sec. 9711(c)(1)(iv). In sentencing Lesko to death, the jury expressly found this aggravating circumstance (the Nicholls murder) and further concluded that the two aggravating circumstances present were sufficient to outweigh all mitigating circumstances. Specifically, the jury found as follows:JUROR NO. 5: This 3rd day of February, A.D., 1981, we, the jury, unanimously sentence the defendant, John Charles Lesko, to death.
 
 
 140
 We, the jury, have found unanimously one or more aggravating circumstances which outweigh all the mitigating circumstances.
 
 
 141
 The aggravating circumstances we have found are: The victim, Leonard Clifford Miller, was a peace officer who was killed in the performance of his duties. A policeman is a peace officer.
 
 
 142
 Two: The defendant has been convicted of another crime, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable.
 
 
 143
 N.T. 1731-32.
 
 
 144
 It is clear that an improper introduction of Lesko's prior conviction would have contributed to the jury's sentence of death. If one of the aggravating circumstances were removed, it is impossible to determine whether or not the jury would have imposed a death sentence. In any event, "[i]n a case involving a decision as important as life and death we are not in a position to speculate about what decision the jury might have reached had it not considered one [of the two] particular aggravating circumstance[s]." Commonwealth v. Travaglia, 502 Pa. at 509, 467 A.2d at 306 (Pa.1983) (Nix, J., concurring). The denial of at least an evidentiary hearing to determine the validity of Lesko's guilty plea violates all notions of due process.
 
 
 145
 The United States Supreme Court in Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983) stated that, "although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." Surely an attack upon the validity of a guilty plea that has been used as a basis for a finding of an aggravating circumstance constitutes the type of contention that must be reviewed before the execution of the capital sentence may be allowed.
 
 
 146
 Accordingly, because I would affirm the district court's grant of the Writ of Habeas Corpus, I respectfully dissent.
 
 
 
 [1]
 Pennsylvania law classifies felony murder as second degree murder, and thus not punishable by death. 18 Pa.Cons.Stat.Ann. Sec. 2502(b) (Purdon 1982)
 
 
 [2]
 Appellee strenuously maintains in this appeal that whereas Travaglia advanced the theory that the shooting had been accidental, Lesko's own defense to the first degree murder charge was that he was at most guilty of felony murder. Appellee Brief at 15. Assuming that Lesko has accurately portrayed the substance of his defense, this distinction does not alter our analysis. A defense based on the felony-murder scenario, like one based on an "accidental" murder theory, asserts the lack of requisite intent for first degree murder, and as we later discuss, thereby opens the door to the Commonwealth's introduction of evidence to rebut such a claim
 
 
 [3]
 Rutherford's additional testimony, including that concerning the acquisition of the gun that killed Officer Miller and certain incriminating comments petitioner made before and after the Miller shooting, are not the subject of the current appeal
 
 
 [4]
 Under Pennsylvania law, a conviction for first degree murder carries the sanction of either the death penalty or life imprisonment. See 42 Pa.Cons.Stat.Ann. Sec. 9711 (Purdon 1982)
 
 
 [5]
 Death sentences in Pennsylvania are subject to automatic appeal to the Pennsylvania Supreme Court. 42 Pa.Cons.Stat.Ann. Secs. 722, 9711 (Purdon 1982)
 
 
 [6]
 The district court found that Lesko's habeas corpus petition raised a substantial question as to whether an instruction that the jurors not consider sympathy for the defendant violated the Eighth Amendment. The district court stayed Lesko's execution pending resolution by the United States Supreme Court of California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), which concerned the constitutionality of an instruction very similar to the one given the Lesko jury. The Court in Brown found that the instruction in question did not violate the Eighth or Fourteenth Amendments. Id. at 541, 107 S.Ct. at 839. The district court did not, however, rule on the constitutionality of the jury instruction in Lesko's trial
 
 
 [7]
 This court has held that in a collateral proceeding, where the reviewing court finds that the admission of evidence violates due process by denying defendant a fair trial, that court must then subject this constitutional error to harmless error review. See Bisaccia v. Attorney Gen. of New Jersey, 623 F.2d 307, 312-13 (3d Cir.) (finding denial of due process in admission into evidence of co-conspirators plea, and remanding to district court to determine whether constitutional error was harmless), cert. denied, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980). We note a certain overlap in analysis here, i.e., once there is a finding of a denial of a fair trial, it is difficult to envision how such an error could be considered "harmless." We also note that not every court of appeals applies harmless error analysis to this constitutional error. Compare Bisaccia, 623 F.2d at 312-13 and Dudley v. Duckworth, 854 F.2d 967 (7th Cir.1988), with (Panzavecchia v. Wainwright, 658 F.2d 337, 341-42 (5th Cir.1981)), cert. denied --- U.S. ----, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989)
 
 
 [8]
 At oral argument it was also suggested that the "abuse of discretion" standard--the standard accorded a district court's balancing of prejudice and relevance pursuant to Federal Rule of Evidence 403--might be applicable here. It is not. This deferential standard is generally accorded the trial judge who has a unique vantage point to assess possible prejudice. See United States v. Guerrero, 803 F.2d 783, 785 (3d Cir.1986) (Rule 403 requires considerable deference on part of reviewing court to the "hands-on" judgment of trial judge); United States v. Long, 574 F.2d 761, 767 (3d Cir.) (trial judge, not appellate judge, in best position to assess the extent of prejudice caused a party by a piece of evidence, because appellate judge works with a "cold record," whereas trial judge is "there in the courtroom"), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). In a habeas corpus proceeding, however, where the district court functions not as a trial court, but as an appellate court that draws legal conclusions from a cold record, the deference we accord the district court's "evidentiary rulings" is unwarranted
 
 
 [9]
 Pennsylvania law defining accomplice liability provides in pertinent part:
 * * *
 (c) Accomplice defined.--A person is an accomplice of another person in the commission of an offense if:
 (1) with the intent of promoting or facilitating the commission of the offense, he:
 * * *
 (ii) aids or agrees or attempts to aid such other person in planning or committing it....
 
 
 [18]
 Pa.Cons.Stat.Ann. Sec. 306 (Purdon 1983)
 
 
 [10]
 We note that the trial court refused to admit testimony that the .22 caliber gun, seen on the person of Lesko, could also tie defendants to the Newcomer and Levato murders, which were committed a few days earlier. In that instance, the trial court found that the "prejudice outweighs the probative value."
 
 
 [11]
 We note that under Pennsylvania law, the least degree of concert or collusion is sufficient to sustain a finding of responsibility as an accomplice. Commonwealth v. Coccioletti, 493 Pa. 103, 109, 425 A.2d 387, 390 (1981)
 
 
 [12]
 Former Sec. 9711, in force when Lesko was tried, provides in pertinent part:
 (d) Aggravating circumstances.--Aggravating circumstances shall be limited to the following:
 (1) The victim was a ... peace officer ... killed in the performance of his duties.
 * * *
 (10) The defendant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable....
 
 
 [42]
 Pa.Cons.Stat.Ann. Sec. 9711. Section 9711 was amended in 1986. See Act of July 7, 1986. P.L. No. 400, No. 87, Sec. 1
 
 
 [13]
 On direct appeal of Lesko's conviction and sentence, the Pennsylvania Supreme Court ruled that the legislature intended the term "conviction" to include a guilty plea. Commonwealth v. Travaglia, 502 Pa. at 496-97, 467 A.2d at 298-99
 
 
 [14]
 We do not find it significant that the Beasley decision interpreted Sec. 9711(d)(11), rather than Sec. 9711(d)(10) which is at issue in our case, as the Beasley rationale applies equally to both sections. Additionally, in determining that the term "conviction" in Sec. 9711(d)(11) did not require that a defendant actually have been sentenced, the Beasley court expressly relied on its prior interpretation of the term "conviction" in Sec. 9711(d)(10), thereby implying that the term "conviction" as it appears in these sections should be read consistently
 
 
 [15]
 We note that Pennsylvania's view that prior convictions play an integral role in character analysis is shared by a majority of states. A multi-state survey reveals that most post-Gregg state sentencing statutes concentrate on the defendant's character and behavioral propensities, rather than on the circumstances of the crime for which he is being sentenced. See 65 A.L.R. 4th Sec. 2[a] at 851-52 (1988). These statutes are thought to address the likelihood that defendant will in the future inflict further harm on society, see id., a consideration that the Supreme Court has validated as relevant to the sentencing determination, see California v. Ramos, 463 U.S. 992, 1003, 103 S.Ct. 3446, 3454, 77 L.Ed.2d 1171 (1983)
 
 
 [16]
 In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), the plurality opined that an informed jury was a prerequisite to a fair sentencing procedure. The plurality wrote,
 If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about the defendant and the crime he committed in order to be able to impose a rational sentence, it is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.
 Id. at 190.
 
 
 [1]
 Lesko's counsel did not argue that the shooting was accidental. The majority acknowledges that the accidental shooting theory does not apply with respect to Lesko. Maj. op. at 54
 
 
 [2]
 Rule 403 provides;
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....
 Fed.R.Evid. 403.
 
 
 [3]
 Rule 404(b) provides:
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [4]
 The difficulty in determining where one crime begins and another ends is illustrated in our recent decision in United States v. Balascsak involved an interpretation of the phrase "three previous convictions" as used in the Armed Career Criminal Act, we noted that "[d]etermining whether two crimes were 'committed on occasions different from one another' may often require an evidentiary hearing." Id. In Balascsak, two burglaries occurred some time between 10:45 P.M. and 7:00 A.M. We noted that "[w]e have no idea whether the interval was fifteen minutes or eight hours" or whether there was any "time to sober up and reconsider between the separate incidents." Id. Similarly, the majority here does not allow for the possibility that Lesko may have had a change of heart
 
 
 [5]
 Aside from the question of whether Beasley is constitutional, it is not clear that the Pennsylvania Supreme Court would go as far as the majority suggests. In Commonwealth v. Travaglia, 502 Pa. 474, 467 A.2d 288 (Pa.1983), the Pennsylvania Supreme Court considered several challenges to statements made by the prosecutor during the sentencing phase. The Supreme Court commented that:
 We again observe that the balance of principles which results in certain rules being appropriate at the "guilt phase" of a trial, may be struck differently at a hearing to determine appropriate penalty. The prosecutor's statement of his personal belief in the defendant's guilt can in no way be prejudicial where guilt has already been determined.
 Prejudice might otherwise arise from a reference to the victim if such reference has the effect of arousing the jury's emotions to such a degree that it becomes impossible for the jury to impose sentence based on consideration of the relevant evidence according to the standards of the statute. We find the statements of the prosecutor in this case to have made minimal reference to the victim.
 
 
 [502]
 Pa. at 501-02, 467 A.2d at 302. The Pennsylvania Supreme Court seems to indicate that if the prosecutor had reminded the jury of the details of the Nicholls murder during the sentencing hearing, prejudice would be more likely to result. See Travaglia, 502 Pa. at 493-94, 501-02, 467 A.2d at 198, 302. I do not see this as a strong basis for distinction. The admission of the details in the guilt phase, even absent prosecutorial embellishment or misconduct, could work an injustice of constitutional magnitude upon a capital defendant in the sentencing phase
 Furthermore, in Beasley, the only evidence which came in was the fact that "the jury was informed that one of appellant's prior murder convictions involved the killing of a police officer, and that the jury in that case had returned a verdict of death." 505 Pa. at 289, 479 A.2d at 465 (footnote omitted). The Pennsylvania Supreme Court had already indicated in Travaglia that a prosecutor's "minimal reference to the victim" would not be offensive. Unlike the jury in the present case, the jury in Beasley was spared a graphic description of the murder.
 
 
 [6]
 Indeed, much authority exists to support the proposition that any circumstances concerning the crime for which the defendant is being presently sentenced may be considered. See e.g., Gregg v. Georgia, 428 U.S. 153, 203-04, 96 S.Ct. 2909, 2939 ("[s]o long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions"); see also Williams v. Oklahoma, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); Commonwealth of Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 58 S.Ct. 59, 82 L.Ed. 43 (1937)
 
 
 [7]
 I do not believe that the majority's citation of Carolina v. Gathers, --- U.S. ----, 109 S.Ct. 2207, 104 L.Ed.2d 876, is apt. See Maj. op. at 58. In Gathers, the United States Supreme Court affirmed the judgment of the Supreme Court of South Carolina which reversed Gather's sentence of death in light of the prosecutor's suggestion during the sentencing phase that the defendant deserved a death sentence because the victim was a religious man and a registered voter. The Supreme Court states that, "[a]t no time then, or otherwise during the guilt phase, was there any reference to the content of the papers [the victim] had with him." --- U.S. at ----, 109 S.Ct. at 2208-09. Thus, Gathers does not address the issue of whether the admission of evidence in the guilt phase may prejudice the jury in the sentencing phase, thereby depriving the capital defendant of due process
 
 
 [8]
 This situation described is the converse of the one in the present case: the danger is that evidence which should only be admissible in the penalty phase may infect the determination of guilt in the guilt phase if admitted in the guilt phase
 
 
 [9]
 Lesko raised the claim of ineffective assistance of counsel for the first time on appeal from the denial of his motion to withdraw his guilty plea. See Commonwealth v. Lesko, 502 Pa. 511, 514, 467 A.2d 307, 308 (Pa.1983). Without any evidentiary hearing, the Pennsylvania Supreme Court rejected the claim. Because Lesko has not raised this claim in his petition, I decline to comment on the possible merits of such a related claim
 
 
 [10]
 It should be noted that Armstrong, Lesko's Indiana counsel, was representing him at the time and thus, did not actually testify
 
 
 [11]
 The following colloquy between Judge Mihalich and Counsel for Lesko, Welsh White, during the Post Conviction Hearing proceedings in Westmoreland County, illustrates the attempt by counsel to distinguish between the issues litigated before the Supreme Court of Pennsylvania and the issue of the alleged broken plea agreement:
 MR. WHITE: I would submit to Your Honor that, as Mr. Marsh has said, the Pennsylvania Supreme Court never had before it Mr. Armstrong's testimony concerning the exact terms of the bargain made between him and the district attorney of Indiana County. In Justice Nix's opinion, which Your Honor referred to, the Court was ruling in effect that a guilty plea with deferred sentencing may, under Pennsylvania Law, may be properly introduced at a subsequent murder prosecution.
 THE COURT: That is what I did.
 MR. WHITE: We are not challenging that. We challenged that before the Pennsylvania Supreme Court and we agree that issue is finally determined.
 The new issue we wanted to raise here is it was an understanding between counsel and the basis of the defendant's guilty plea that the guilty plea in Indiana County would not be introduced in Westmoreland County.
 THE COURT: Yes, but I was not a part of that agreement nor was the district attorney of Westmoreland County a part of that agreement. So how is it relevant here? We didn't breach any of his rights. We didn't agree that would be a part of the plea. To me it was immaterial then and, unless you impress me with something else, it's immaterial now.
 MR. WHITE: If we can establish that the bargain between Indiana County district attorney and Mr. Armstrong was that the guilty plea was not to be introduced at any subsequent criminal trial, then we would submit we are entitled to specific performance and we would cite--
 THE COURT: What are you doing here? I can't give you that specific performance. Indiana County can.
 MR. WHITE: Not at this point. Because the agreement has already been breached. The agreement that was made between counsel prior to the Indiana County trial was that the guilty plea would not be introduced at any subsequent proceeding. Now may be that counsel of Indiana County lacked the power to implement the terms of that agreement. But if so, he presented the defendant with an illusory promise. He was promising the defendant something he was unable to perform.
 THE COURT: If it has any relevance, has any legal effect, don't you agree it belongs in Indiana County?
 MR. WHITE: Not at this point. The defendant really has no objection to the guilty plea in Indiana County because he was willing to plead guilty to murder in that county solely upon the basis that that would not be used in the subsequent trial in Westmoreland County.
 ....
 THE COURT: My ruling was it's immaterial. It's not a part of this evidence.
 MR. MARSH: It is our position that the Commonwealth is a unified judicial system; that the Commonwealth is not various fiefdoms in Indiana County and Westmoreland County; the district attorney representative of the Commonwealth in Indiana County binds the Commonwealth in any other county by his agreement. And I know this Court has previously stated it did not feel bound by any agreement between the Commonwealth and the defendant in Indiana County. Of course, the basis of our petition here is that is not the law; that what the Commonwealth agrees to in Indiana County must be honored in Westmoreland County; and that the district attorney of Indiana County and the district attorney of Westmoreland County are bound by prior agreements between the Commonwealth and the defendant.
 ....
 THE COURT: It is my ruling that that testimony that you present in your offer is irrelevant to this case.
 Post Conviction Hearing Proceedings, Held January 28, 1985, No. 681 of 1980 at 7-14 (emphasis added). As the above-cited portions of the record indicate, Lesko's counsel attempted to distinguish between the issues previously addressed and the "new issue" of whether Lesko's plea was induced by his counsel on the basis of a promise which was unfulfilled.
 In denying Lesko's motion for an evidentiary hearing, Judge Mihalich noted that he could not be bound by a plea entered into in Indiana County. This is clear error. In Pennsylvania, it is well established that the prosecuting attorneys of the Commonwealth's various counties each represent the Commonwealth of Pennsylvania. See Commonwealth ex rel. Specter v. Martin, 426 Pa. 102, 113, 232 A.2d 729, 736 (Pa.1967) (district attorneys do not perform their duties on behalf of either a county or a city, but rather, "all of the duties of the district attorney are performed on behalf of the Commonwealth.") (emphasis in original); Commonwealth ex rel. Specter v. Freed, 424 Pa. 508, 517, 228 A.2d 382, 386 (Pa.1967) ("the district attorney is essentially a state officer whose powers, duties and functions are not affected by the [Philadelphia City] Charter"). Accordingly, a plea agreement made by the district attorney of Indiana County is made on behalf of the Commonwealth of Pennsylvania. Thus, the terms are binding on the Westmoreland County district attorney when that district attorney represents the Commonwealth in a subsequent prosecution.
 
 
 [12]
 Pennsylvania's Post-Conviction Hearing Act provides that: "To be eligible for relief under [it], a person ... must prove ... (4) That the error resulting in his conviction and sentence has not been finally litigated or waived." 42 Pa.Cons.Stat.Ann. Sec. 9543(4)(1982) (This section has been suspended by Pa.R.Crim.P., Rule 1507, 42 Pa.Cons.Stat.Ann., insofar as it is inconsistent with Rules (Supp.1988))
 The Act further provides that "an issue is finally litigated if: ... (3) the Supreme Court has ruled on the merits of the issue." 42 Pa.Cons.Stat.Ann. Sec. 9544(a)(3)(1982) (also suspended (Supp.1988)).
 It is also highly unlikely that this issue could be deemed to be waived under Pennsylvania law. See Commonwealth v. Zettlemoyer, 500 Pa. 16, 50, 454 A.2d 937, 955 n. 19 (Pa.1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In Zettlemoyer, the Pennsylvania Supreme Court recognized the qualitative difference between death and any other permissible form of punishment by relaxing the rules of waiver which would normally preclude review of the merits of this claim. The court stated:
 The primary reason for this limited relaxation of waiver rules is that, due to the final and irrevocable nature of the death penalty, the appellant will have no opportunity for post-conviction relief wherein he could raise, say, an assertion of ineffectiveness of counsel for failure to preserve an issue or some other reason that might qualify as an extraordinary circumstance for failure to raise an issue.... Accordingly, significant issues perceived sua sponte by this Court, or raised by the parties, will be addressed and, if possible from the record, resolved.
 
 
 [500]
 Pa. at 50, 454 A.2d at 955 n. 19. Thus, any argument that Lesko waived this claim because he could have raised it but did not, fails. See also Commonwealth v. McKenna, 476 Pa. 428, 439-41, 383 A.2d 174, 180-81 (Pa.1978)
 
 
 [13]
 Such a challenge, today, would be unsuccessful under Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)
 
 
 [14]
 The Pennsylvania Supreme Court, in affirming the denial of Post-Conviction relief, merely relied on statements made during the hearing on Lesko's petition to withdraw his plea and on the plea colloquy. See Commonwealth v. Lesko, 509 Pa. 67, 82-84, 501 A.2d 200, 208 (Pa.1985)
 On a prior occasion, the Pennsylvania Supreme Court, in affirming the denial to withdraw Lesko's plea, based its denial of an evidentiary hearing by referring to the same statements--the plea colloquy during the proceedings in the Indiana County action and the statements made in a proceeding in connection with Lesko's motion to withdraw his plea. See Commonwealth v. Lesko, 502 Pa. 511, 514, 467 A.2d 307, 308 (Pa.1983).
 It is noted that in the latter proceeding, Lesko was not represented by counsel who had been appointed to defend him in the death penalty case. Lesko's Westmoreland County counsel were not notified of this proceeding and thus, could not participate. It is difficult to see how Attorney Armstrong could act both as witness and as counsel at the same time.
 
 
 [15]
 42 Pa.Cons.Stat.Ann. Sec. 9711(d)(10) provides:
 (d) Aggravating circumstances.--Aggravating circumstances shall be limited to the following:
 ....
 (10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.